IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____ )
                           )
LEVITON MANUFACTURING )
COMPANY, INC., )
         Plaintiff )
                           )
        v. )         Civil Action No. AMD 03-1701
                           )
UNIVERSAL SECURITY )
INSTRUMENTS, INC., et al., )
         Defendants )
_____ )
                           )
SHANGHAI MEIHAO ELECTRIC, INC., )
         Plaintiff )
                           )
        v. )         Civil Action No. AMD 03-2137
                           )
LEVITON MANUFACTURING )
COMPANY, INC., )
         Defendant )
_____ _ )

MEMORANDUM OPINION

      This opinion concerns two lawsuits pertaining to a device called a ground fault circuit

interrupter (GFCI).[1] In the first case, No. AMD 03-1701, plaintiff Leviton Manufacturing

_____

      [1]A GFCI is a type of electrical outlet that protects a consumer from electric shock when an
electrical device is connected to a power source and a ground fault occurs.  A ground fault occurs
when a separate current path is created in addition to the current flowing from the electrical power
source through the electrical device and back to the power source. This may happen, for example,
due to wear and tear of the electrical device, or when the electrical device becomes wet.  When a
                                                                   (continued...)

Company, Inc., accuses defendants Universal Security Instruments, Inc., and USI Electric, Inc. (collectively "USI"), of, among other things, patent infringement and trade dress infringement. The second case, No. AMD 03-2137, was instituted by Shanghai Meihao Electric, Inc. ("Meihao"), a Chinese corporation that manufactures GFCIs for USI's distribution in the United States. Meihao (joined by USI) seeks a declaratory judgment that, *inter alia*, it did not infringe any of the patents in controversy.

Leviton's patent infringement claims are based on four patents: U.S. Patent No. 6,040,967 (the "'967 patent"), U.S. Patent No. 6,246,558 (the "'558 patent"), U.S. Patent No. 6,381,112 (the "'112 patent") and U.S. Patent No. 6,437,953 (the "'953 patent"). The trade dress infringement claims, brought under Maryland law and the Lanham Act, 15 U.S.C. § 1051, *et seq*., concern, *inter alia*,  the appearance of the face of the Leviton device.

Discovery has concluded and now pending are cross-motions for summary judgment; each has been exhaustively briefed by the parties and a hearing is not necessary. USI seeks summary judgment as to Leviton's claims of trade dress infringement. In addition, Meihao (joined by USI) and Leviton have filed motions for summary judgment on the patent infringement claims. For the reasons stated herein, I shall deny the motion filed by USI respecting the trade dress infringement claim as well as Leviton's motion respecting patent

---

[1](...continued)
GFCI detects a ground fault, the GFCI causes the electrical circuit to "trip," i.e., to open, and the flow of current is stopped.  After the circuit is interrupted, the GFCI can be reset so that electrical current is again allowed to flow through the electrical circuit.  The Leviton-marketed device based on the patents at issue in these cases is unique because it can only be reset when it is "operational," thereby preventing a consumer from resetting a GFCI that cannot detect a future ground fault.

infringement. I shall grant the motion (seeking a declaration of non-infringement of the

Leviton patents) filed by Meihao (and joined in by USI).[2]

I.

The cases have reached this point by a circuitous route. In an earlier action, filed on

December, 13, 2001, Leviton alleged against USI claims for trade dress infringement and

patent infringement based on U.S. Patent No. 4,595,894 (the "'894 patent"). *See Leviton*

*Mfg. Co., Inc. v. Universal Security Instruments, Inc.*, 304 F. Supp. 2d 726 (D.Md. 2004)

(*"Leviton I"*). The trade dress claim from *Leviton I* is essentially identical to the trade dress

claim asserted in the instant controversy.  The '894 patent, which expired on June 17, 2003,

described an invention that used sensing circuitry to detect a current imbalance created when

a ground fault occurred, and a trip mechanism to separate the electrical contacts to interrupt

the flow of electrical current in response to the ground fault. In *Leviton I*, I denied USI's

motion for summary judgment as to Leviton's claim for trade dress infringement, and I

granted in part and denied in part USI's motion for summary judgment as to Leviton's claim

for patent infringement in respect to the '894 patent. *Id*. Subsequently, I continued the trial

of the surviving claims in *Leviton I* for consolidation with the trial on the claims asserted in

these cases.

The instant actions were filed during the pendency of *Leviton I*. On June 10, 2003,

---

[2]Leviton also seeks exclusion of the testimony of a USI expert witness bearing on the trade dress infringement claim. I shall defer ruling on the motion to exclude the expert testimony until the pretrial conference.

Leviton filed its action against USI for trade dress infringement and infringement of six patents.[3] On July 7, 2003, Meihao filed its own complaint requesting a declaratory judgment of non-infringement.[4] Leviton then filed a counterclaim against Meihao alleging infringement of the patents.

The patents at issue here introduced a "reset lock-out" feature that improves consumers' safety by preventing the GFCI from being reset after it has incurred some damage and can no longer provide ground fault protection. The '894 design was modified so that the sensing circuitry and, in turn, the trip mechanism, are activated when the reset button is pushed. The "reset lock-out" feature ties the resetting of the GFCI device with the circuit interrupting feature such that everything that would have to be operating properly in order to detect a ground fault and interrupt the circuit must be operating properly in order for the user to reset (and thus, to continue employing) the device.

After holding a *Markman* hearing, I issued a Claims Construction Order on April 22, 2005. *See* 2005 WL 936990 (D.Md., April 22, 2005). The Claims Construction Order considered the following claims: claims 1, 5, 7 and 12 of the '967 patent; claims 1, 5 and 22 of the '112 patent; claims 1, 8 and 10 of the '070 patent ; claims 1, 2 and 4 of the '558 patent; and claims

---

[3]In addition to the four patents mentioned above that are considered in this opinion, Leviton's complaint included U.S. Patent No. 6,282,070 (the "'070 patent") and U.S. Patent 6,288,882 (the "'882 patent"). Leviton no longer asserts the '070 patent. The '882 patent infringement allegation was dismissed without prejudice on March 3, 2005.

[4]Meihao and USI initially alleged that Leviton's patents were unenforceable for various reasons. The parties, however, stipulated on July 15, 2005, to the dismissal of those allegations without prejudice.

1, 5, 7 and 14 of the '953 patent. The contested limitations revolved around five terms and phrases, which I construed in the Claims Construction Order: (1) "reset lock-out;" (2) "reset mechanism;" (3) "activates said circuit interrupter;" (4) "operational" (and "non-operational"); and (5) "trip mechanism" (as used in the '070 patent). *See* 2005 WL 936990, at *8-*13.

II.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate in a patent case as in any other case. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 992 F.2d 792, 795-96 (Fed. Cir. 1990). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment if, when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In patent litigation, it is often the case that some dispositive issues present questions of law for the court rather than questions of fact for the factfinder. As to such issues, final resolution on summary judgment is often appropriate. *Leviton Mfg. Co., Inc.,* 304 F. Supp. 2d at 734

n.4.

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Only a "genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation" can create a factual dispute that may not be resolved as a matter of law. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed. Cir. 1989). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

## III.

I first consider USI's motion for summary judgment on the claim of trade dress infringement. As mentioned above, USI's challenge, via motion for summary judgment, was thoroughly examined in *Leviton I*, in which I ruled that Leviton had made a sufficient

showing of all the elements of a trade dress claim such that USI's motion for summary judgment had to be denied. In the instant action, USI has not put forth any material facts that distinguish the new claim from the old claim. Rather, USI has relied principally on an allegedly "clarifying" decision of the Fourth Circuit, *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003), *cert. denied*, 540 U.S. 1106 (2004), that it says tilts the record for summary judgment in its favor.

I am not persuaded that *International Bancorp*, which was decided well before my decision in *Leviton I*, but was not cited by the parties in that case, should alter my conclusion. To the contrary, after having carefully reviewed *International Bancorp* and the contentions of the parties, and having considered the facts in the light most favorable to Leviton, the non-movant, I conclude that Leviton's claim for trade dress infringement survives summary judgment. USI's motion shall be denied.

## A.

Leviton alleges trade dress infringement of the "non-functional appearance and arrangement" of its GFCI. Compl. ¶ 12. Leviton's trade dress is comprised of, *inter alia*, the color of the faceplates of its GFCIs and the arrangement of the "test" and "reset" buttons on the faceplate.[5] Opp'n to Mot. for Summ. J. at 10. Furthermore, Leviton argues that its GFCI

---

[5]Just as it argued unsuccessfully in *Leviton I*, USI again asserts that Leviton has failed to sufficiently describe its asserted trade dress. As I rejected that contention in that case, 304 F. Supp. 2d at 735 n.5, I reject it here. It is clear on the face of the Leviton complaint that its trade dress is the outward appearance of its GFCI face plate. Moreover, it is clear that the outward appearance of the faceplate is comprised of, among other things, its color and the configuration of its buttons.

has acquired secondary meaning so that consumers have "come to recognize the well-known appearance and arrangement of the elements of Leviton's GFCI product line, and [associate] that appearance and arrangement with Leviton as the source of such products." Compl. ¶ 12. USI refutes these claims by arguing that, *inter alia*, Leviton fails to show that its trade dress has secondary meaning and the faceplate's colors and configuration are functional, and thus non-protectable, elements.

Section 43(a) of the Lanham Act creates a cause of action for trade dress infringement.  15 U.S.C. § 1125(a).  "Trade dress" is a product's total image and overall appearance, and it may include attributes such as color and shape.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992). To prevail on its claim of trade dress infringement, Leviton must establish that: (1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion;[6] and (3) the trade dress either (a) is inherently distinctive or (b) has acquired secondary meaning.  *Id.* at 769; *Ashley Furniture Indus. v. Sangiacomo N.A.* 187 F.3d 363, 368 (4th Cir. 1999); *Leviton Mfg. Co., Inc.,* 304 F. Supp. 2d at 736-38.

"In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982); *see also TrafFix Devices, Inc. v. Marketing Displays,*

---

[6]As was the case in *Leviton I*, USI does not dispute that Leviton put forth facts alleging actual confusion. Therefore, for the purpose of this motion, USI is deemed to have conceded this point. The court will not address it any further.

*Inc.*, 532 U.S. 23, 31-34 (2001). A feature is functional "if exclusive use of the feature would put competitors at a significant nonreuptation-related disadvantage." *Tools USA & Equip Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir. 1996) (quoting *Qualitex Co. v. Jacobson Prods.*, 514 U.S. 159, 165 (1995)); *Leviton Mfg. Co., Inc.*, 304 F. Supp. 2d at 736-38.

B.

I concluded in *Leviton I* that Leviton put forth sufficient evidence to show non-functionality of the face of its GFCI. There is no reason to change course at this time. USI argues that, with the exception of a recently added "SmartLock®" trademark, "every feature on Leviton's GFCI faceplate is functional." Mem. Supp. Mot. for Summ. J. at 19. USI then attempts to paint a picture of GFCI configuration in which designers have no choice but to arrange the device the same way the Leviton device is arranged.[7] In addition, USI argues that the color of the Leviton faceplaces is "aesthetically functional." *Id*. at 12.[8]

Essentially, USI relies on the following flawed syllogism: (1) functional items are not

---

[7]USI undermines this position to some degree, however, by pointing out that Eagle Manufacturing Company makes a GFCI that differs in configuration by placing its buttons horizontally. USI also admitted that in copying the Leviton design, as discussed *infra* in text, it did not wish to "reinvent the wheel." Grossblatt Deposition, Tr. 240:7-8.

[8]As relevant here, a design might be described as "aesthetically functional" and not protectable under trademark law if the design is "an important ingredient in the commercial success of the product." *Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631, 643 (2d Cir. 1979) (affirming denial of preliminary injunction), *rev'd on other grounds sub nom. Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982). For example, a camouflage pattern appearing on jackets used by hunters may contain patterns and colors which are themselves the very essence of the product being sold-- and its functionality.

protected; (2) Leviton's trade dress includes functional items; and (3) therefore, as a matter of law, Leviton's trade dress cannot be protected.  This is certainly not the case. *See Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991) (rejecting the same line of reasoning), *aff'd*, 505 U.S. 763 (1992). As the First Circuit pointed out in *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 37 (1st Cir. 1998):  "[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection."  *See also Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 134-35 (D. Mass. 2003) (quoting the same).  In other words, while the buttons on the Leviton GFCI certainly have functional value, by no means does that preclude Leviton from asserting that their configuration or design is non-functional.  The element of arbitrariness required in *I.P. Lund Trading ApS*, moreover, is supported by the fact that other manufacturers of GFCIs use different configurations.  That much is apparent from the deposition testimony of Steve Campolo, USI's Rule 30(b)(6) corporate designee:

> Q.    You were asked some questions about buttons earlier, do you recall?
> A.    Yes.
> Q.    Can buttons come in different shapes as far as the outer appearance?
> A.    Certainly.
> Q.    Have you ever seen different shaped buttons on competitors?
> A.    Yes.
> Q.    Is it fair to say that a party wishing to copy another design has a choice between different shaped buttons?
>
> *    *    *
>
> A.    Certainly.

Campolo Deposition, Tr. 198:10 to 199:14. Viewing the facts in the light most favorable to

the plaintiff, this is enough to show that the configuration of the faceplate is non-functional and thus a protectable trade dress element.

USI also argues (again) that the color of the face of the Leviton GFCI cannot be protected. The law is more nuanced than USI would suggest and, ultimately, is to the contrary.[9] The "trade dress of a product is essentially its total image and overall appearance." *Two Pesos, Inc.*, 505 U.S. at 765 n.1 (quoting *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989)). It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)). Just as the configuration of the buttons on Leviton's GFCI are part of the protected trade dress, so is the color.

The court is not persuaded by USI's argument that Leviton's distinct colors are "aesthetically functional." The fact that USI may want to match the color of its devices so that they can be used with Leviton's electrical devices does not vitiate the purpose and the right of Leviton to protect its trade dress. USI would have a stronger argument if Leviton were asserting infringement based solely on color; however, Leviton is asserting that color is *part of the GFCI trade dress*, along with the overall design of the device and the

---

[9]*See American Waltham Watch Co. v. United States Watch Co.*, 173 Mass. 85, 87, 53 N.E. 141, 142 (1899)(Holmes, J.)("It is true that a man cannot appropriate a geographical name; but neither can he a color, or any part of the English language, or even a proper name to the exclusion of others whose names are like his. Yet a color in connection with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line.").

configuration of the "test" and "reset" buttons.

C.

In order for Leviton to survive summary judgment as to trade dress infringement, it must also put forth evidence that its product either is inherently distinctive or has secondary meaning. *Two Pesos, Inc.,* 505 U.S. at 769; *Ashley Furniture Indus.,* 187 F.3d at 368. Because Leviton's allegation of trade dress infringement involves its GFCI's configuration and color, neither of which can be inherently distinctive, Leviton must show secondary meaning. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 162-63 (1995) (holding that color cannot be inherently distinctive); *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 212 (2000) (holding that product design can never be inherently distinctive); *Leviton Mfg. Co., Inc.*, 304 F. Supp. 2d at 736-38. By showing secondary meaning, Leviton demonstrates that the color and appearance if its GFCI identify Leviton as the source of the product in the minds of the public. *Inwood Laboratories, Inc.*, 456 U.S. at 851 n.11.

Again, the court addressed this issue, on virtually the same facts, in *Leviton I. See* 304 F. Supp. 2d at 736-38. The only new element that USI brings to the instant debate is the consideration of *International Bancorp v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003). USI asserts that "[w]hether and to what extent an accused trade dress infringer bears the burden of proof was a procedural point of confusion that precluded summary judgment in USI's favor in *Leviton I*," but the "Fourth Circuit clarified this point of confusion in International Bancorp." While it is true that

*International Bancorp* adds some clarity to the burden shifting scheme for proving secondary meaning, that case does not persuade me to alter my ruling.

In *International Bancorp*, a casino owner, Societe des Bains de Mer et du Cercle des Estrangers a Monaco ("SBM"), accused a gambling web site of violating the Lanham Act and infringing on its rights to the name "Casino of Monte Carlo." *International Bancorp*, 329 F.3d at 361. The Fourth Circuit affirmed the trial court, which held that SBM had proved secondary meaning with a showing that the online casino "*directly* and *intentionally* copied the 'Casino de Monte Carlo' mark." *Id*. at 371. In doing so, the court relied upon the burden shifting scheme from *Larsen v. Terk Technologies*, 151 F.3d 140 (4th Cir. 1998), which in turn had relied on *Osem Food Industries Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161 (4th Cir. 1990), and *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421 (4th Cir. 1986). The *International Bancorp* Court took *Larsen* to stand for the proposition that "a trademark[10] plaintiff that proves that the defendant directly and intentionally copied its mark is presumed to have proved that mark's secondary meaning, and the defendant must then disprove that presumption." *International Bancorp*, 329 F.3d at 371.

Of particular interest in the instant case is the process by which a defendant can rebut the presumption that arises from proof that he copied the plaintiff's trade dress (or, in the case of *International Bancorp*, plaintiff's trademark). In the key passage from *International*

---

[10]The Fourth Circuit in *International Bancorp* also explained that *Larsen* has the same precedential force whether it is applied to a trademark case or a trade dress case. 329 F.3d at 371.

*Bancorp* on this issue, the Fourth Circuit hypothesizes that the plaintiff will win the battle of secondary meaning "unless the [defendant][11] companies proffered some evidence, not ultimately persuasive evidence, just some evidence, that the fact finder concluded was probative in disproving secondary meaning." *Id*. at 371 (emphasis in original).

What *International Bancorp* does not do is define "probative evidence" for the purpose of disproving secondary meaning after one party has copied the trade dress of another. Direction on that issue, however, can be found in *Osem Food Industries Ltd.* In *Osem Food Industries Ltd.*, the Fourth Circuit quotes approvingly from *My-T-Fine Corp. v. Samuels*, 69 F.2d 76 (2d. Cir. 1934), in which Judge Learned Hand writes, "a late comer who deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile." *Osem Food Industries Ltd.*, 917 F.2d at 164. That principle makes sense. Because evidence of copying is extraordinarily strong proof of secondary meaning-- regardless of what the accused claims his intent to have been after the fact-- a defendant is unlikely to rebut that presumption unless he can show that, despite his efforts, he was unable to mimic the preexisting trade dress.[12]

---

[11]The original quote says "plaintiff" because the case involved a motion for declaratory judgment of non-infringement.

[12]One example of such a "futile" attempt to copy can be found in *Kann v. Diamond Steel Co.*, 89 F. 706 (8th Cir. 1898). In that case, one company making crushed steel abrasives accused another company making a similar product of copying its logo, which featured a drawing of a diamond. The picture of a diamond used in the logo of the alleged infringer looked entirely different
(continued...)

USI is unable to satisfy this standard on the present record. It offers no evidence that it failed in its effort to copy the Leviton GFCI. The "evidence" it does offer, furthermore, is taken from *Leviton I* and twisted out of context. USI asserts that Leviton's showing of secondary meaning (through proof of copying) is overcome by the fact that Leviton allows private labeling of its GFCIs. The source of this contention is footnote 7 of *Leviton I*. *Leviton Mfg. Co., Inc.*, 304 F. Supp. 2d at 736 n.1. This "evidence" fails for two reasons. First, the evidence is not probative of USI's futility in copying the Leviton device. Second, footnote 7 does not say that non-exclusivity of use is probative of a lack of secondary meaning, as USI asserts. Rather, footnote 7 says exactly the opposite: "[T]he fact that Leviton has permitted private labeling of its GFCI does not defeat its claim for trade dress infringement . . . . [N]on-exclusivity does not defeat a finding of secondary meaning, particularly here where the burden has been shifted as a result of direct evidence of copying."

---

[12](...continued)

from the original diamond – so much so that it was difficult to discern that both drawings were the same object. Yet, the fact that a diamond had been used in both logos was at least circumstantial evidence of copying. The court held that "[i]f the . . . appellees ever had such a purpose [to copy], they never used any means calculated to accomplish it, and they adopted those admirably suited to defeat it. Their intention, therefore, becomes immaterial." *Id*. at 712.

Perhaps a modern example would be if an athletic footwear company intentionally tried to copy the well-known trade dress or trade mark owned by Nike, Inc. If, for example, the alleged trade dress infringer put the famous Nike "swoosh" upside-down – such that consumers did not confuse it with the authentic Nike® product – it could be argued that the attempt to copy had been futile, thereby rebutting the assumption of secondary meaning. In reality, of course, it is clear that the Nike "swoosh" has attained secondary meaning and indeed, is "famous." *Nike, Inc. v. Variety Wholesalers, Inc.*, 274 F.Supp.2d 1352 (S.D.Ga. 2003), *aff'd without op*., 107 Fed.Appx. 183 (5th Cir., May 3, 2004)( Table).

*Id.*

Direct evidence of copying certainly exists in this case.  As stated in *Leviton I*, the deposition testimony of Harvey Grossblatt,  President and Chief Financial Officer of USI, is sufficient evidence of copying to shift the burden of "disproving the presumption" of secondary meaning to USI:

> Q: What is on [page 4893]?
> A: 4893 is an e-mail from [USI Chairman Michael Kovens] to [the manufacturer's representative, Barkley Bao], dated August 23, 2000, talking about ivory and almond GFCI colors.
> Q: In the second paragraph it says: This is the second time you have sent me samples to match up against Leviton.
> A: Yes.
> Q: What does that refer to?
> A: Color samples.  He sent them Leviton samples asking them to match up the colors.
> Q: Those are Leviton GFCI samples?
> A. Yes.

*Leviton Mfg. Co., Inc.*, 304 F. Supp. 2d at 736 (quoting Dep. Test. of Harvey Grossblatt, Feb. 12, 2003).

This deposition testimony, and evidence of e-mail exchanges between Bao and Kovens,[13] is certainly enough to show that USI intentionally copied Leviton's GFCI.  That evidence, in turn, establishes a rebuttable presumption of secondary meaning. Because USI

---

[13]The e-mail exchanges between Bao and Kovens, which are the subject of the excerpted deposition testimony, show USI's clear attempts to match the Leviton colors. In a July 25, 2000, letter Kovens writes Bao: "What are your comments about the [i]vory color from your perspective and do you believe that you can get it closer to the Leviton?" *Leviton Mfg. Co., Inc.*, 304 F. Supp. 2d at 737.

offers no substantial evidence that it failed in its effort to copy Leviton's GFCIs, secondary meaning is established for purposes of the instant motion. Accordingly, Leviton has put forth sufficient evidence to survive summary judgment on its claim of trade dress infringement and USI's motion shall be denied.

IV.

I now turn to the patent law issues. Meihao (joined by USI) seeks summary judgment of non-infringement of the four patents relating to the "reset lock-out" of the Leviton GFCI.[14] Leviton moves for summary judgment against Meihao and USI[15] for infringement of claims 5 and 22 of the '112 patent. These issues, in large part, hinge on the claims construction I issued April 22, 2005. I see no reason to change the way I construed the disputed claims. Therefore, as explained below, I shall deny Leviton's motion for summary judgment of infringement and grant Meihao's motion for summary judgment of non-infringement.

A.

Patent infringement determinations require a two-step analysis: (1) the asserted claims of the patent must be properly construed to determine their meaning and scope; and (2) the

---

[14]In a Stipulation filed with the court July 15, 2005, the parties agreed that Meihao and USI would dismiss without prejudice claims and defenses asserting that the Leviton patents in suit are unenforceable. For that reason, the court will not consider the issue of unenforceability.

[15]Leviton initially brought an action against USI for patent infringement in Case No. AMD 03-1701. Meihao then brought a declaratory judgment action against Leviton, to which Leviton responded by filing a counterclaim for infringement against Meihao in Case No. AMD 03-2137. In this opinion, I will often refer to the infringing party only as "Meihao." These references should be taken to include USI, the company that sells the Meihao devices.

claims as properly construed must be compared to the allegedly infringing device. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

In the Claims Construction Order, I undertook to follow the guidelines that have been established in this area of law. The claims are construed from the perspective of a person of ordinary skill in the field of invention. *Hoechst Celanese Corp. v. B.P. Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed. Cir.1996). The analytical focus of claim construction begins with and remains centered on the language of the claims themselves. *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). A court principally consults the evidence intrinsic to the patent, including the claims, the specification, and the relevant prosecution history. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004).

Although it is improper to read a limitation from the patent specification into claims, claims must be read in view of the specification, of which they are a part. *Markman,* 52 F.3d at 979; *see also Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (patent claim "must be interpreted in light of the teachings of the written description and purpose of the invention described therein"). The Federal Circuit Court of Appeals has observed:

> The specification, of which the claims are part, teaches about the problems solved by the claimed invention, the way the claimed invention solves those problems, and the prior art that

> relates to the invention. These teachings provide valuable
> context for the meaning of the claim language.

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1554 (Fed. Cir. 1997).

The Federal Circuit recently reaffirmed this principle: "As we stated in *Vitronics*, the

specification 'is always highly relevant to the claim construction analysis. Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips v. AWH

Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*,

90 F.3d 1576, 1582 (Fed. Cir. 1996)).

## B.

In the Claims Construction Order, I gave the following constructions to four disputed

terms:

> Reset lock-out (means plus function):[16] The latching finger of
> the latching member working in cooperation with the contact arm, and
> equivalents thereof that perform the identical function of inhibiting the
> resetting of the electrical connection unless the circuit interrupter is
> operational.

> Reset mechanism (means plus function): The primary function
> of the reset mechanism is to allow an interrupted circuit to be reset, i.e.,
> to reestablish electrical continuity between the input and output
> conductive paths or conductors after continuity has been broken. To
> accomplish this, the reset mechanism works in conjunction with the
> circuit interrupter and the reset lock-out... In other words, activation
> of the reset mechanism tests the operation of the circuit interrupter,

---

[16]"Reset lock-out" was construed to be synonymous with "reset lock-out means," reset lock-out portion," "reset lock-out device," "reset actuator lockout," and "reset lockout portion." Claims Construction Order, 2005 WL 936990, at *8.

which if operational, disables the reset lock-out.

Activates said circuit interrupter:[17] This means activating or utilizing the sensing circuitry and the trip mechanism as when a fault or simulated fault occurs.

Operational: This must be construed to mean "working properly," and further, that both the sensing circuitry and the trip mechanism must be working properly. When the circuit interrupter is "operational," it is able to sense a fault and interrupt electrical continuity in response to the fault. "Non-operational" is the opposite of "operational" and must mean that the sensing circuitry or the trip mechanism, or both, are not working properly, such that the circuit interrupter is either not able to detect a fault or not able to interrupt the electrical continuity when the fault occurs.

With these constructions in mind, I will consider the issue of whether Meihao infringed claims 5 and 22 of the '112 patent. Here, as is the case with all of the claims at issue, the key word is "operational." This word is important because the Leviton patents cover a device with a reset lock-out that prevents the device from resetting after a ground fault unless the unit is "operational." Thus, the gravamen of the Leviton invention lies in its ability to test itself to first determine if it is "operational," then reset, then, in the event of a second ground fault (or simulated ground fault), trip again. If the device is not "operational," the reset lock-out should prevent it from resetting-- thereby preventing the consumer from using a damaged CFCI that can no longer determine whether a ground fault has occurred.

---

[17]"Activates said circuit interrupter" is synonymous with "enabling said circuit interrupter," "activates said circuit interrupting mechanism," "said circuit interrupter is activated," and "circuit interruption portion is activated." Claims Construction Order, 2005 WL 936990, at *14.

The accused Meihao device, on the other hand, uses technology that falls short of the technology protected by the Leviton patents. It does test for *some elements* of "operational," but, Meihao correctly argues, it does not test for *all elements* of "operational" and therefore does not have a reset lock-out as envisioned by the Leviton patents-in-suit.

My construction of "operational" favors Meihao because its relative expansiveness comports with the elements reading on the Leviton invention. It requires both the sensing circuitry, which detects faults, and the trip mechanism, which interrupts the circuit, to be working properly. Leviton, perhaps realizing that this construction severely hampers its case for infringement, argues against it two ways. First, by moving for summary judgment only on claims 5 and 22 of the '112 patent, Leviton focuses on claims in which there is room to make semantic arguments that "operational" does not mean what it appears to mean (and therefore the reset lock-out is not what I defined it to be in the Claims Construction Order). Second, Leviton argues that the Federal Circuit's decision in *Phillips, supra*, somehow undermines my Claims Construction Order.[18]  I disagree.

_____

[18]Leviton argues in its brief as follows:

Meihao's entire non-infringement position ultimately rests on its allegation that activation of both the fault sensing circuitry and the trip mechanism is required by "each and every asserted claim." Meihao then alleges that the Meihao [GFCI] does not activate, or test, the entire "circuit interrupter," including the entire tripping mechanism and sensing circuit. However, as is detailed in this Cross-Motion, no such limitation, requiring activation of both the fault sensing circuitry and the trip mechanism, is present in the claim language of at least Claims 5 and 22 of the '112 patent. To adopt Meihao's flawed construction would improperly import a limitation from the patent

(continued...)

In claims 5 and 22 of the '112 patent, the word "operational" does not stand alone. Rather, the claims refer to "non-operational" (claim 5)[19] and "operational state" (claim 22).[20] Leviton asserts that these phrases mean something other than what would normally be construed based on the Claims Construction Order's definition of "operational." The logic

_____

[18](...continued)
        specification onto the claims in violation of Federal Circuit precedent. This
        Court, of course, did not have the benefit of reviewing *Phillips* before issuing
        its [Claims Construction].
Mem. Supp. Cross-Mot. for Summ. J. at 4-5 (citations to Meihao's brief omitted).

   [19]Claim 5 reads as follows: "A circuit interrupting device comprising: a housing; a first electrical conductor disposed at least partially within said housing and capable of being electrically connected to a source of electricity; a second electrical conductor disposed at least partially within said housing and capable of conduction electrical current to a load when electrically connected to said first electrical conductor; a circuit interrupter disposed within said housing and configured to cause electrical discontinuity between said first and second conductors upon the occurrence of a predetermined condition; a reset mechanism configured to reestablish electrical continuity between the first and second conductors after said predetermined condition occurs; and a reset lock-out that prevents reestablishment of electrical continuity between said first and second conductors if said circuit interrupter is *non-operational*." (Italicized for emphasis).

   [20]Claim 22 reads as follows: "A circuit interrupting device comprising: a housing; a first electrical conductor disposed at least partially within said housing and capable of being electrically connected to a phase line; a second electrical conductor disposed at least partially within said housing and capable of conducting electrical current to a phase line of a load when electrically connected to said first electrical conductor; a third electrical conductor disposed at least partially within said housing and capable of being electrically connected to a neutral line; a fourth electrical conductor disposed at least partially within said housing and capable of conducting electrical current to a neutral line of a load when electrically connected to said third electrical conductor; a circuit interrupter disposed within said housing, the circuit interrupter having an operational state and a non-operational state and configured to cause electrical discontinuity between said first and second conductors upon the occurrence of a predetermined condition; a reset device configured to reestablish electrical continuity between the first and second conductors after said discontinuity is caused; and a reset lock-out device that prevents reestablishment of electrical continuity between said first and second conductors if said third electrical conductor is not connected to a neutral line; and wherein activation of the reset device activates the circuit interrupter to be in the *operational state* to move the reset lock-out device to a reset position."  (Italicized for emphasis)

behind this assertion is somewhat difficult to follow. When referring to claims 5 and 12, Leviton states: "These claims do not require that the circuit interrupter be 'operational,' only that it not be 'non-operational' in order for the reset lock-out to allow resetting." Mem. Supp. Cross-Mot. for Summ. J. at 16. When referring to "operational state," Leviton asserts that "although this Court construed the term 'operational' in its pre-*Phillips* Opinion, the Court did not consider the meaning of "operational state," as used in the context of Claim 22." *Id.* at 15.

These are arguments that only a lawyer could make. When I defined "operational" in the Claims Construction Order, I meant exactly what I said. "Operational" means that both the sensing circuitry and the trip mechanism are working properly. "Operational state" means the state in which the device is "operational" – or the state in which both the sensing circuitry and the trip mechanism are working properly.

"Non-operational" means the opposite of "operational" – that the sensing circuitry or the trip mechanism, or both, are not working properly. It is true, as Leviton points out, based on the Claims Construction Order, a device could be "non-operational" if only the sensing circuitry or the trip mechanism were not working properly (rather than requiring both to be non-functional). This, however, does not mean that the invention claimed by claim 5 of the '112 patent could only test for one of those two elements. Rather, implicit in the definition of "non-operational"-- based on the Claims Construction Order's characterization of it being the opposite of "operational"-- is that the invention tests both the sensing circuitry

and the trip mechanism.

After I issued my Claims Construction Order, the Federal Circuit published the *Phillips* opinion. Leviton correctly points out that *Phillips* adds some clarity to the claims construction process. It gives a lengthy explanation of the relationship between a claim and a specification. *Phillips*, 415 F.3d at 1326-29. The Court warns that "the written description part of the Specification itself did not delimit the right to exclude. That was the function and purpose of the claims." *Id*. at 1326. Based on this principle, courts must always guard against importing limitations from the patent specification into the claims.

*Phillips* also details the value of the specification in claims construction: "This court and its predecessors have long emphasized the importance of the specification in claim construction." *Id*. at 1327. The Court continues:

> The importance of the specification in claim construction derives from its statutory role. The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112, para. 1 . . . . In light of the statutory directive that the inventor provide a "full" and "exact" description of the claimed invention, the specification necessarily informs the proper construction of the claims.

*Id*. at 1328 (citations omitted). The Court then concludes its passage on the relationship between specification and claim by stating: "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id*. at 1329.

Applying the well-established principles reaffirmed in *Phillips* to the '112 patent, it is clear that "non-operational" and "operational state," like "operational," are used in a context such that they refer to a device in which both the sensing circuitry and the trip mechanism must be properly functional in order for the device to reset.  By looking to the description of the patent, the court is not importing new limitations; rather it is merely seeking to clarify any ambiguity in claims 5 and 22.  The specification clears up this confusion more than once:  "In other words, this arrangement ensures that once the circuit interrupting device has been reset, it has the ability to again break electrical continuity between the input and output conductive paths *because the sensing circuitry and trip mechanism of the circuit interrupter are utilized for resetting the continuity*." '112 Patent, col.3, ll. 29-34 (italicized for emphasis).  "Using the reset lock-out feature described above permits the resetting of the GFCI device . . . only if the circuit interrupter (or circuit interrupting mechanism) is operational." '112 Patent, col.6, ll. 39-44.  The use of these passages from the patent specification to clarify claims 5 and 22 is well within the reasoning and the spirit of *Phillips*.

## D.

In conformity with *Markman*, I now turn my attention to the second prong of the two-part inquiry: determining whether Meihao infringed the claims I have clearly defined. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).  An accused device infringes a claim directly only when  that device embodies every limitation

of that claim, literally or by substantial equivalent. *Warner-Jenkins Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 15, 29 (1997); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).  Literal infringement occurs when every element of a patent claim is met "exactly" in the accused device or process.  *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).

Literal infringement, however, is not always necessary. Under the doctrine of equivalents, an element is present if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed element. *Pennwalt Corp. v. Durland-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987); *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424-25 (Fed. Cir. 1997) (a claim element is equivalently present in an accused device only if "insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device"); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989).

The second part of the *Markman* inquiry is easily resolved here.  Meihao has offered indisputable evidence showing that its device does not activate both the fault sensing circuitry and the trip mechanism when the device resets.  More specifically, Meihao, through its expert, Gene Hayes, has put forth evidence that its device does not test the differential transformer (DT) or the integrated circuit (IC) when the device is reset (by pressing the reset button). Haynes Decl. ¶¶ 17, 32; *see also* video demonstration by Lu Huayang of Meihao, attached to Haynes Decl. as Ex. D (demonstrating that the Meihao device can reset even

though the DT and IC have been intentionally destroyed). This showing is enough to defeat Leviton's motion for summary judgment of infringement as to claims 5 and 22 of the '112 Patent. The motion shall be denied.

V.

The final matter for consideration is Meihao's motion for summary judgment (joined by USI) of non-infringement of all asserted claims.  Once again, this motion hinges on the definition of the word "operational," which is present in every asserted claim through the "reset lock-out" structure. The Meihao device neither contains a "reset lock-out," nor the equivalent of a "reset lock-out." Accordingly, as a matter of law, Meihao's devices cannot infringe the Leviton patents-in-suit. Meihao's motion for summary judgment (joined by USI) of non-infringement shall be granted.

In addition to the 5 and 22 claims of the '112 patent, which are discussed above, Meihao seeks a judgment of non-infringement on the following claims: claims 1, 5, 7 and 12 of the '967 patent; claims 1 and 2 of the '558 patent; claim 1 of the '112 patent; and claims 5 and 7 of the '953 patent.  Claim 1 of the '967 patent is typical of all the claims at issue:

> A circuit interrupting device comprising: a housing; at least one input conductor disposed at least partially within said housing and capable of being electrically connected to a source of electricity; at least one output conductor disposed within said housing and capable of conducting electrical current to a load when electrically connected to said at least one input conductor; a circuit interrupter disposed within said housing and configured to break said electrical connection

between said input and output conductors in response to the occurrence of a predetermined condition; a reset lock-out responsive to the occurrence of said predefined condition such that said reset lock-out is operable between a lock-out position wherein said reset lock-out inhibits resetting of said electrical connection between said input and output conductors and a reset position wherein said reset lock-out does not inhibit resetting of said electrical connection between said input and output conductors; and a reset mechanism operatively associated with said reset lock-out and said circuit interrupter such that activation of said reset mechanism activates said circuit interrupter which facilitates movement of said reset lock-out from said lock-out position to said reset position by said reset mechanism.

As discussed in detail above, the word "operational," as used in the Leviton patents, requires that the device test both the sensing circuitry and the trip mechanism before resetting. This word is part of the construction of the means-plus-function term "reset lock-out" that I construed in the Claims Construction Order. *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.") A "reset lock-out" device performs the function of "inhibit[ing] the resetting of the electrical connection unless the circuit interrupter is operational." Claims Construction Order, 2005 WL 936990, at *10. Because the Meihao device does not test to see if the circuit interrupter is "operational," as envisioned by the Leviton patents, it cannot possibly have a "reset lock-out." Without a "reset lock-out," the Meihao GFCI cannot literally infringe the Leviton patents.

The Meihao device also does not infringe as the equivalent of a means-plus-function claim. To infringe as a section 112, paragraph 6, equivalent, an element must perform the identical function in substantially the same way to achieve substantially the same result as the claimed element. *Kemco Sales, Inc. v. Control Papers, Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000). This is a heightened standard because equivalents under section 112, paragraph 6, must perform the identical function, while equivalents under the customary doctrine of equivalents need only perform a substantially similar function. *Id.* (citing *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320-21 (Fed. Cir. 1999)). Insofar as it does not test the sensing circuitry and the trip mechanism, the Meihao device does not perform the identical function as claimed in the Leviton patents.

The Meihao device also does not achieve substantially the same result. Meihao's GFCI in some instances allows a consumer to reset the device even if parts of the sensing circuitry are damaged so that it is unable to detect a ground fault. This defeats one of the core purposes of the invention claimed in the Leviton patents: to protect consumers from faulty GFCIs that are resettable and likely to give consumers a false sense of security. *See* Report of Leviton Expert Jaime De La Ree ¶ 17 (stating that "[i]n cases where the GFCI is tripped and is damaged, it is very dangerous to the consumer to allow such a GFCI to be reset"). Ironically, it is the lack of safety of the Meihao device that helps it defeat allegations of patent infringement.

To defeat Meihao's motion for summary judgment of non-infringement, Leviton must

provide evidence that creates a factual dispute as to whether Meihao infringed the patents at issue. In light of the Claims Construction Order already issued by this court, this is a difficult task. Leviton arguably has created a factual dispute on some technical issues, such as whether the Meihao device has the equivalent of a "latching finger."[21]  However, the court need not delve into those issues because it is clear that the Meihao device does not perform the same function as the Leviton patents. Therefore, the Meihao device cannot infringe the Leviton patents.  Because there is no dispute of material fact, Meihao's motion for summary judgment (joined by USI) as to non-infringement shall be granted, and an appropriate declaration shall be entered.

## VI.

For the reasons stated above, the respective motions for summary judgment shall be denied and granted, as indicated. In No. AMD 03-2137, a final declaratory judgment shall be entered as requested by Meihao. In No. AMD 03-1701, after the court confers with counsel, a prompt trial shall be calendared.

Filed: January 18, 2006                         _____/s/_____

ANDRE M. DAVIS
UNITED STATES DISTRICT JUDGE

---

[21]The "latching finger," as construed by this court, is the part of the reset lock-out that works in cooperation with a contact arm to perform the function of inhibiting the resetting of the electrical connection unless the circuit interrupter is functional. Claims Construction Order, 2005 WL 936990, at *10.  Leviton argues that the Meihao device has a part that is the equivalent of this latching finger. I need not consider this issue under the circumstances here.